USCA1 Opinion

 

 February 18, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1773 ROBERT GOLDMAN, Plaintiff, Appellant, v. FIRST NATIONAL BANK OF BOSTON, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Higginbotham,* Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Denise M. Leydon with whom Weston, Patrick, Willard & Redding was ________________ __________________________________ on brief for appellant. Richard P. Ward with whom Robert B. Gordon and Ropes & Gray were ________________ ________________ ____________ on brief for appellee. ____________________ February 18, 1993 ____________________ ____________________ *Of the Third Circuit, sitting by designation. CYR, Circuit Judge. The First National Bank of Boston CYR, Circuit Judge. _____________ terminated the employment of appellant Robert Goldman pursuant to a reduction in force in 1989. Goldman sued the Bank, asserting, inter alia, age discrimination in violation of 29 U.S.C. 621- _____ ____ 634 ("ADEA") and Mass. Gen. L. ch. 151B, and breach of a lifetime employment contract. The district court granted summary judgment in favor of the Bank. We affirm. I I BACKGROUND BACKGROUND __________ In 1957 the Bank hired Robert Goldman as a clerk in its Settlement Department. Goldman recalls that Lee Beaulieu, the personnel officer who interviewed him for the job, told him at the time he was hired that he would not become wealthy working for the Bank, but would have a job for life unless he committed a criminal act against the Bank. Goldman also recalls that Beauli- eu said the Bank had never laid off an employee.2 Over the ensuing thirty-two years, Goldman held various positions with the Bank. During the final four years, he worked as a Custody Administrator in the Custody Administration Unit of Capital Asset Services, a division of the Treasury and Banking Services Department, providing administrative services relating ____________________ 2Goldman recollects that similar representations were repeated by various supervisors throughout the course of his employment with the Bank. to the Bank's custodial security accounts.3 In 1989, the Bank launched a large-scale reduction in its work force due to mounting losses in its Treasury and Banking Services operation. The Bank completely reorganized the Treasury and Banking Services Department, reconfiguring approximately 252 operational functions into approximately 135 functions. As a result, 119 positions were eliminated. Thomas Keane, Senior Operations Manager of the Capital Asset Services Department, determined that it was necessary to eliminate three of the fifteen positions in the Custody Administration Unit. After reviewing recent employee performance evaluations and consulting with unit supervisors, Keane selected three employees for dismissal: a twenty-four year old, a thirty-seven year old, and Goldman, then fifty-two. Keane explained that the twenty-four year old was suspected of misusing a corporate credit card; the thirty-seven year old and Goldman were considered the ____________________ 3The Bank is a custodian of securities for various clients, including banks, insurance companies, colleges, and other insti- tutions. Custody Administrators provide necessary administrative services for the securities accounts of these clients, and their work involves settling trades according to client instructions and assuring the proper and accu- rate recording of transactions that affect these ac- counts. The Bank strives to be competitive in this business by having administrators who provide efficient customer service, and who communicate frequently with clients both to assure the accuracy of transactions and to address any potential problems with the administra- tion of their accounts. Affidavit of James W. Curran, Account Mgr., Custody Administra- tion Unit. 3 weakest performers in the unit. Keane represents that Goldman was responsible for the fewest customer accounts, with the lowest aggregate market value, and that Goldman's low volume resulted in large measure from the reassignment of some of Goldman's accounts due to client complaints. All three positions were permanently eliminated and Goldman's duties were absorbed by the remaining employees in the Custody Administration Unit. II II DISCUSSION DISCUSSION __________ A. Summary Judgment Standard A. Summary Judgment Standard _________________________ We review a grant of summary judgment de novo, employ- __ ____ ing the same criteria incumbent upon the district court in the first instance. Pedraza v. Shell Oil Co., 942 F.2d 48, 50 (1st _______ _____________ Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 993 (1992). _____ ______ Summary judgment is appropriate where the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Canal Ins. Co. v. Benner, ___ ______________ ______ __ F.2d , (1st Cir. 1992), No. 92-1360, slip op. at 5 (1st ___ ____ Cir. Nov. 24, 1992); see also Mesnick v. General Elec. Co., 950 ___ ____ _______ _________________ F.2d 816, 822 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. ____ ______ Ct. 2965 (1992). The nonmoving party "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . must set 4 forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). See Anderson v. Liberty Lobby, ___ ________ ______________ Inc., 477 U.S. 242, 248 (1985). There is no trialworthy issue ____ unless there is enough competent evidence to enable a finding favorable to the nonmoving party. Id. at 249 (citing First Nat'l ___ ___________ Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 _________________ ___________________ (1968)). Moreover, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appro- priate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st ____________ ___________________________ Cir. 1990). B. Age Discrimination Claims4 B. Age Discrimination Claims _________________________ 1. The Burden-Shifting Paradigm 1. The Burden-Shifting Paradigm ____________________________ A plaintiff alleging age discrimination "bears the ultimate 'burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been ____________________ 4The complaint alleged parallel claims under the ADEA and its Massachusetts counterpart, Mass. Gen. L. ch. 151B. On appeal, Goldman asserts for the first time that Massachusetts applies a less onerous standard of proof to claims brought under the Massachusetts antidiscrimination statute than this court applies to ADEA claims, and that his Massachusetts claim there- fore must be addressed separately. Goldman's opposition to summary judgment did not distinguish between the federal and state age discrimination claims, and he relied solely on federal precedent. Consequently, the district court's analysis did not distinguish between the state and federal age discrimination claims. We follow suit, as "theories not raised squarely in the district court cannot be surfaced for the first time on appeal." McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 22 (1st _____ _________________________________ Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 1939 (1992). ____ ______ See Mesnick, 950 F.2d at 829 n.11. ___ _______ 5 fired but for his age.'" Mesnick, 950 F.2d at 823 (quoting _______ Freeman v. Package Machinery Co., 865 F.2d 1331, 1335 (1st Cir. _______ ______________________ 1988)). Absent direct evidence of age discrimination, the familiar burden-shifting framework established in McDonnell _________ Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), comes into ______________ _____ play. Lawrence v. Northrop Corp., ___ F.2d ___, ___ (1st Cir. ________ _______________ 1992), No. 92-1702, slip op. at 4 (1st Cir. Nov. 25, 1992); Mesnick, 950 F.2d at 823; Medina-Munoz, 896 F.2d at 8. First, _______ ____________ the plaintiff must make a prima facie showing of discrimination, McDonnell Douglas, 411 U.S. at 802; Lawrence, slip op. at 4; __________________ ________ Biggins v. Hazen Paper Co., 953 F.2d 1405, 1409 (1st Cir.), cert. _______ _______________ ____ denied, ___ U.S. ___, 112 S. Ct. 3035 (1992) and cert. granted, ______ ____ _______ ___ U.S. ___, 112 S. Ct. 2990 (1992); Mesnick, 950 F.2d at 823; _______ that is, Goldman must demonstrate that he (1) was at least forty years of age, (2) met the employer's legitimate job performance expectations, (3) experienced adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifica- tions. Id.; Medina-Munoz, 896 F.2d at 8. A plaintiff whose ___ ____________ employment was terminated in the course of a reduction in force need not demonstrate that he was replaced, but may show that "the ________ employer did not treat age neutrally or that younger persons were retained in the same position." Hebert v. Mohawk Rubber Co., 872 ______ _________________ F.2d 1104, 1111 (1st Cir. 1989); see Lawrence, slip op. at 5; ___ ________ Connell v. Bank of Boston, 924 F.2d 1169, 1173 n.5 (1st Cir.), _______ _______________ cert. denied, ___ U.S. ___, 111 S. Ct. 2828 (1991). _____ ______ 6 "Establishment of the prima facie case . . . creates a presumption that the employer unlawfully discriminated against the employee," Texas Dep't of Community Affairs v. Burdine, 450 _________________________________ _______ U.S. 248, 254 (1981), and the burden of production shifts to the defendant-employer to "articulate some legitimate, nondis- criminatory reason" for the termination. McDonnell Douglas, 411 _________________ U.S. at 802; Lawrence, slip op. at 5; Biggins, 953 F.2d at 1409; ________ _______ Mesnick, 950 F.2d at 823. The burden of persuasion remains with _______ the plaintiff-employee at all times. Lawrence, slip op. at 5; ________ Mesnick, 950 F.2d at 823 (citing Burdine, 450 U.S. at 253); _______ _______ Medina-Munoz, 896 F.2d at 9. ____________ The presumption of unlawful age discrimination generat- ed by the plaintiff-employee's prima facie showing dissipates, however, provided the employer sustains its burden of production; the plaintiff-employee must then demonstrate that the proffered reason for the adverse employment action was simply a pretext for age discrimination. Lawrence, slip op. at 6; Mesnick, 950 F.2d ________ _______ at 823; Connell, 924 F.2d at 1172. The plaintiff must do more _______ than cast doubt on the employer's justification for the chal- lenged action; there must be a sufficient showing that discrimi- natory animus motivated the action. Lawrence, slip op. at 6-7; ________ Mesnick, 950 F.2d at 824; Villanueva v. Wellesley College, 930 _______ __________ _________________ F.2d 124, 127-28 (1st Cir.), cert. denied, ___ U.S. ___, 112 S. ____ ______ Ct. 181 (1991); Connell, 924 F.2d at 1172. Direct or indirect _______ evidence of discriminatory motive may do, but "the evidence as a whole . . . must be sufficient for a reasonable factfinder to 7 infer that the employer's decision was motivated by age animus." Connell, 924 F.2d at 1172 n.3; see also Lawrence, slip op. at 6- _______ ___ ____ ________ 7, Mesnick, 950 F.2d at 825; Villanueva, 930 F.2d at 128. _______ __________ Under First Circuit caselaw, the plaintiff-employee must adduce minimally sufficient evidence of pretext and discrim- ___ inatory animus. Lawrence, slip op. at 6-7 (citing Mesnick, 950 ________ _______ F.2d at 825; Villanueva, 930 F.2d at 127; Connell, 924 F.2d at __________ _______ 1172; Medina-Munoz, 896 F.2d at 9; Olivera v. Nestle Puerto Rico, ____________ _______ ___________________ Inc., 922 F.2d 43, 48 (1st Cir. 1990)). A showing that the ____ employer's justification was not the actual motive may be enough if the facts and circumstances raise a reasonable inference of age discrimination. Connell, 924 F.2d at 1175. Nevertheless, _______ the plaintiff-employee cannot avert summary judgment if the record is devoid of direct and circumstantial evidence of dis- ___ criminatory animus on the part of the employer. Lawrence, slip ________ op. at 6-7 n.1.5 ____________________ 5Appellant argues that our cases place a more onerous burden on an ADEA plaintiff than that envisioned by the Supreme Court in McDonnell Douglas and Burdine. Accord Connell, 924 F.2d at 1183 __________________ _______ ______ _______ (Bownes, J., dissenting) (suggesting that Burdine permits a _______ plaintiff to prove employment discrimination "either by direct ______ evidence of discrimination or by successfully rebutting the __ employer's articulated reasons."). We do not agree. Fed. R. Civ. P. 56 requires the nonmoving party to demonstrate the existence of a dispute of material fact; in order to do so, Goldman "must raise an inference of discriminatory motive under- lying the pretextual explanation." Villanueva, 930 F.2d at 128 __________ (citing Medina-Munoz, 896 F.2d at 9). It is not the province of ____________ the courts to sit as "super personnel departments, assessing the merits or even the rationality of employers' nondis- criminatory business decisions." Mesnick, 950 F.2d at 825. "The _______ 'ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age.'" Id. ___ (quoting Freeman v. Package Machinery Co., 865 F.2d 1331, 1341 _______ _____________________ 8 The Bank does not challenge the district court ruling that Goldman made out a prima facie age discrimination claim. Nor does Goldman challenge the finding that the Bank met its burden at the second stage of the McDonnell Douglas burden- __________________ shifting analysis by articulating a nondiscriminatory motive for ____________ Goldman's dismissal; namely, that economic considerations neces- sitated a reduction in force and Goldman was selected for termi- nation because he was "the weakest performer and least qualified employee" in his unit. At the third and final stage of the McDonnell Douglas analysis, the district court ruled that Goldman _________________ had failed to present sufficient evidence either to rebut the Bank's proffered justification for Goldman's dismissal or to support an inference of discriminatory animus. The Bank accord- ingly won summary judgment on the state and federal age discrimi- nation claims. Contending that the district court weighed the competing evidence, rather than viewing it in the light most favorable to him, Goldman maintains that there is sufficient record evidence of pretext and age animus to clear the summary judgment hurdle. 2. Evidence of Pretext 2. Evidence of Pretext ___________________ "In assessing pretext, [our] 'focus must be on the perception of the decisionmaker,' that is, whether the employer ________ ____________________ (1st Cir. 1988)). Since an employer's nondiscriminatory motiva- tions for adverse employment decisions are irrelevant in an age discrimination case, a "mere showing that the employer's articu- lated reason may shield another (possibly nondiscriminatory) reason does not create a dispute of material fact" sufficient to withstand summary judgment. Villanueva, 930 F.2d at 128. __________ 9 believed its stated reason to be credible." Mesnick, 950 F.2d at _______ 824 (quoting Gray v. New England Tel. & Tel. Co., 792 F.2d 251, ____ ____________________________ 256 (1st Cir. 1986) (emphasis added)). Goldman does not dispute that the Bank effected the reduction in force in order to reduce costs. Instead, he argues that he produced enough evidence to rebut the Bank's contention that he was the weakest and least qualified employee in his unit. Goldman established that he had received merit salary increases on a regular basis throughout his tenure with the Bank, received commendations and accolades from Bank clients over the years, and received no warnings relating to his work performance. Although Goldman received mixed perfor- mance evaluations, he disputed their accuracy and fairness. Goldman presented substantial evidence that the Bank did not consider his work performance unsatisfactory in absolute terms. But the Bank consistently has maintained that Goldman was discharged strictly because he was the least qualified employee _____ _________ in the Custody Administration Unit. It submitted comparative evidence as to the account workloads of all custody administra- tors in Goldman's unit. There is no dispute that Goldman, among all custody administrators, was responsible for the fewest accounts, having the lowest aggregate market value. In these circumstances, refutation of the proffered justification for Goldman's discharge required evidence from which the trier of fact reasonably could conclude that Goldman's abilities and qualifications were equal or superior to employees who were retained. As Goldman made no such evidentiary showing, whatever 10 slight shadow of doubt may have been cast upon the proffered justification for his dismissal is too faint to raise the spectre of pretext. 11 3. Evidence of Age Animus 3. Evidence of Age Animus ______________________ Evidence of age animus "need not be of the 'smoking gun' variety," but the totality of the circumstances must permit a reasonable inference that the employer's justification for the challenged action was a pretext for age discrimination. Connell, _______ 924 F.2d at 1175 (citing Burdine, 450 U.S. at 256). Goldman _______ insists that several pieces of evidence, considered collectively or individually, support an inference of discriminatory animus on the part of the Bank. First, Goldman claims that discriminatory animus is infer- able from the affidavits of eight former Bank employees, each stating that the affiant was the eldest, or one of the eldest, employees in a particular unit at the Bank and was performing adequately when dismissed pursuant to the reduction in force. According to Goldman, the fact that several older, long-term employees with satisfactory performance records were terminated could lead a reasonable factfinder to conclude that Goldman would not have been terminated but for his age. On the contrary, as the district court observed, anecdotal evidence of this sort does little more than "corroborate what was undisputed: that members of the protected class were terminated as part of the [reduction in force]." Evidence that eight employees, among the 119 select- ed for dismissal, were among the eldest in their respective units does not give rise to a reasonable inference that older employees were disproportionately affected by the reduction in force, much __________________ less that age discrimination motivated their dismissal. 12 Second, Goldman theorizes that the termination of older, more costly, employees would optimize the cost reductions achieved through the reduction in force. The implication, Goldman suggests, is that the Bank was biased against older employees in effecting the workforce reduction.6 Yet Goldman submitted no evidence either that older employees were more costly to the Bank than younger employees or that older employees were disproportionately affected by the reduction in force. See ___ Mesnick, 950 F.2d at 822 (evidence presented by party opposing _______ summary judgment "'cannot be conjectural or problematic'") (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 ____ ___________________________ (1st Cir. 1989)). Third, Goldman contends that the Bank's introduction of a new retirement plan raised an inference of discriminatory animus. In 1989 the Bank replaced its pension plan with a new "Cash Balance" plan. The Bank informed its employees, at the time, that its objective was "to make the Bank's retirement benefits a visible, attractive benefit to our entire employee population regardless of age" and to "reward employees based ____________________ 6Goldman notes that 41% of the 119 employees terminated in May 1989 were over forty years of age, but that among the 21 ter- minated employees subsequently rehired, only 5, or 24%, were over forty. Statistical evidence that older employees were terminated at a disproportionate rate may provide strong evidence of age discrimination. See Mesnick, 950 F.2d at 824; Connell, 924 F.2d ___ _______ _______ at 1177. However, the present record includes no evidence as to the age composition of the workforce subject to termination, or of the pool of applicants seeking reemployment, against which to compare the data Goldman cites. In fact, at oral argument Goldman disclaimed any statistical argument based on these incomplete data. 13 upon individual performance." Under the new plan, the Bank opened a "Cash Balance" account for each employee and credited the account annually with a percentage of the employee's sala- ry.7 After five years of service, all funds in the Cash Balance account may be withdrawn by employees who are no longer employed by the Bank. Goldman argues that the new plan favors younger employees and raises an inference of age animus because it requires the Bank to deposit a decreasing percentage of salary to the Cash Balance account as the employee reaches the upper service brackets and because its stated purpose is to make the plan more attractive to the 85% of Bank employees for whom the former pension plan represented "a benefit for the distant future." Goldman's argument is deficient, however, in that there is no evidentiary foundation for the premise that the new plan disadvantages older employees. The fact that the Bank contrib- utes decreasing percentages of salary to the Cash Balance account after the employee reaches the thirty-five year service threshold ____________________ 7The percentage of salary credited annually to the Cash Balance account depends on the number of years of service with the Bank: Percentage of Salary Credited Years of Service to Cash Balance Account ________________ ______________________________ 0 - 1 0% 1 - 2 3.25% 3 - 4 4% 5 - 9 5% 10 - 14 6% 15 - 19 8% 20 - 34 11% 35 - 39 6% 40+ 0% 14 is insufficient to create an inference of age animus absent evidence that the resulting retirement benefit would be lower than the benefit the employee would have received under the former plan. Moreover, Goldman's argument ignores the safeguards put in place by the Bank to ensure that employees fifty-five or older with ten years of service, or employees at any age with twenty years of service, would experience no reduction in bene- fits. When an employee in either of these service categories retires or leaves the Bank, benefits are calculated under both the old pension plan and the new Cash Balance plan; the employee is entitled to receive the greater benefit. Thus, these employ- ees cannot be disadvantaged by the introduction of the new plan.8 These safeguards do not necessarily cover all employees in the protected class, however, as those between forty and fifty-five with less than twenty years of service and those fifty-five or older with less than ten years of service at the time the new plan became effective fall outside the scope of the safeguard provision. Rather, at retirement or termination, these employees receive benefits under both plans. The retirement benefit under the former plan is based upon the length of service as at December 31, 1988; under the new plan the benefit consists of the funds accumulated in the Cash Balance account after ____________________ 8Goldman argues that the safeguards would have been unneces- sary if the new plan did not deprive these employees of benefits to which they would have been entitled under the former plan. Clearly, Goldman's argument entirely ignores the safeguards. 15 December 31, 1988. Goldman has adduced no evidence, nor has he argued, that benefits calculated under these provisions are lower than those obtainable under the former pension plan for members of the protected class. Accordingly, no reasonable inference of age bias can be drawn on the present record. Finally, Goldman maintains that the Bank's decision to disband the "Quarter Century Club," a Bank-sponsored social organization for employees with twenty-five years or more of service,9 uniquely and adversely affected older employees and therefore is indicative of age bias. Goldman does not dispute that the Bank stopped funding the Quarter Century Club as part of its program to reduce discretionary costs. There is no direct evidence that considerations of age, as distinguished from neutral cost-saving considerations, entered into the decision to disband the organization, and the bare fact that the Bank stopped funding the Quarter Century Club to reduce costs clearly is insufficient to support a reasonable inference that Goldman's dismissal was motivated by age discrimination. Even viewed collectively, see Mesnick, 950 F.2d at 824 ___ _______ (citing Olivera, 922 F.2d at 50) (We do not "look at evidence of _______ discrimination . . . in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff."), the evidence was insufficient to enable a reasonable factfinder to ____________________ 9The record on appeal contains no evidence as to the bene- fits associated with Quarter Century Club membership. At oral argument, counsel allowed as how members received small gifts in recognition of their loyal service and were honored at an annual dinner. 16 infer that age discrimination motivated the Bank's decision to dismiss Goldman. Stripped of its speculative chaff, at best the record reveals that a small number of those discharged were among the older employees in their respective units, that the Bank implemented a new pension plan which has in no measure been shown to have been disadvantageous to older employees, and that the Bank stopped funding the Quarter Century Club. The gap between this evidence and an inference of age discrimination could only be bridged by impermissible inference. As Goldman established neither pretext nor age animus, the district court correctly granted summary judgment on the age discrimination claims. C. Breach of Lifetime Employment Contract C. Breach of Lifetime Employment Contract ______________________________________ Goldman maintains that Lee Beaulieu, a personnel officer, offered him lifetime employment by representing that the Bank had never laid off employees and that Goldman would have a job for life unless he committed a criminal act against the Bank.10 Even though it is far from clear that the sort of representations made by Beaulieu import an oral offer of lifetime employment, for present purposes we assume as much arguendo. ________ Under Massachusetts law, a lifetime employment contract cannot be found absent evidence that it was made or ratified by an officer or agent with actual or apparent authority to bind the employer to a lifetime contract. See Rydman v. Dennison Mfg. ___ ______ ______________ Co., 373 Mass. 855, 366 N.E.2d 763 (1977); Porshin v. Snider, 349 ___ _______ ______ ____________________ 10Goldman had no written employment contract with the Bank. 17 Mass. 653, 654, 212 N.E.2d 216, 217 (1965); Thalin v. Friden ______ ______ Calculating Mach. Co., 338 Mass. 67, 70, 153 N.E.2d 658, 660 ______________________ (1958); Simonelli v. Boston Hous. Auth., 334 Mass. 438, 440-41, _________ __________________ 137 N.E.2d 670, 672-73 (1956). As there is no evidence that the Bank invested Beaulieu with actual authority to extend a binding offer of lifetime employment to anyone, we need only determine whether Goldman has demonstrated a genuine factual dispute material to the issue of apparent authority. "Apparent or ostensible authority 'results from conduct by the principal which causes a third person reasonably to __ ___ _________ believe that a particular person . . . has authority to enter into negotiations or to make representations as his agent.'" Hudson v. Massachusetts Property Ins. Underwriting Ass'n, 386 ______ ________________________________________________ Mass. 450, 457, 436 N.E.2d 155, 159 (1982) (quoting W. A. Seavey, Agency 8D at p. 13 (1964)) (emphasis added). "It is a 'fundam- ______ ental rule that apparent authority cannot be established by the putative agent's own words or conduct, but only by the princi- ____ __ ___ _______ pal.'" Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991) ___ _________ _____ (quoting Sheldon v. First Fed. Savings & Loan Ass'n, 566 F.2d _______ _________________________________ 805, 808 (1st Cir. 1977)) (emphasis added). We therefore examine the record for conduct on the part of the Bank that could have prompted Goldman reasonably to believe that Beaulieu was autho- rized to hire him as a lifetime Bank employee. A person appointed to a position with generally recog- nized functions may be found to possess apparent authority to perform the duties ordinarily entrusted to one occupying that 18 position. Restatement (Second) of Agency 27 cmt. a (1958). _______________________________ Clearly, Beaulieu, a personnel officer, had either actual or apparent authority to hire Bank employees. Ordinary authority to hire, however, is insufficient to bind the employer to a lifetime employment contract. Boleman v. Congdon and Carpenter Co., 638 _______ _________________________ F.2d 2, 4 (1st Cir.), cert. denied, 454 U.S. 824 (1981) (applying ____ ______ Massachusetts law). "[R]arely . . . [do] circumstances exist which would give rise to apparent authority, of even a principal corporate officer, to employ another for life." Thalin, 338 ______ Mass. at 70, 153 N.E.2d at 660; see Annotation, Power of Corpo- ___ ________________ rate Officer or Agent to Hire Employees for Life, 28 A.L.R.2d ___________________________________________________ 929, 933 (stating that "[i]n the absence of express authority, it has generally been held or recognized that corporate officers or agents do not have the power or authority to hire employees for life"). Goldman suggests that apparent authority should be inferred because his only contact at the time he was hired was with Beaulieu and he had no way of knowing that lifetime employ- ment contracts with the Bank were extraordinary. As the great weight of authority makes clear, however, a corporate personnel officer's general hiring authority does not suffice to establish apparent authority to bind the employer to a lifetime employment contract, irrespective of any awareness on the part of the employee that lifetime employment contracts with the employer were extraordinary. See Rydman, 373 Mass. at 855, 366 N.E.2d at ___ ______ 764 (suggesting that even explicit assurances by corporate 19 officers or agents do not bind a corporate employer to employment contracts of extraordinary duration unless the contract was either made or ratified by an officer with actual or apparent authority to so bind the corporation); Porshin, 349 Mass. at 654, _______ 212 N.E.2d at 217 (finding general manager's authority to hire and fire insufficient to "clothe him with ostensible authority to make a contract for permanent employment"); Simonelli, 334 Mass. _________ at 440-41, 137 N.E.2d at 672 (finding assurances of lifetime employment made by personnel manager and project director insuf- ficient to create lifetime employment contract absent ratifica- tion by the employer); Braden v. Trustees of Phillips Academy, ______ _____________________________ 321 Mass. 53, 71 N.E.2d 765 (1947) (holding that comptroller had no authority to hire assistant comptroller for life absent conduct by employer that could have caused plaintiff-employee reasonably to believe the comptroller was authorized to offer lifetime employment). Holding Beaulieu out as its agent for general hiring purposes did not constitute conduct warranting an objectively reasonable belief that Beaulieu had Bank authority to hire anyone for life. Apparent authority to offer a binding lifetime employ- ment contract may be found in the rare circumstance where it is customary for a particular officer or agent to make such a lifetime contract. 28 A.L.R.2d at 938. See Braden, 321 Mass. at ___ ______ 55, 71 N.E.2d at 766. The Bank submitted competent affidavits attesting that Beaulieu had no actual authority to bind the Bank to a lifetime employment contract and that no employee has a __ ________ 20 lifetime contract with the Bank. Goldman suggests, however, that an inference that lifetime employment contracts were commonplace at the Bank can be drawn from the assurances of Beaulieu and several supervisors that he had a job for life and that no employee had ever been laid off. "Lifetime contracts are extraordinary in their nature and strong proof is required to establish their due formation." Gregory v. Raytheon Serv. Co., 27 Mass. App. Ct. 1170, 1171, 540 _______ __________________ N.E.2d 694, 695 (1989); accord Boleman, 638 F.2d at 4 (finding a ______ _______ putative lifetime employment contract "well within the category of extraordinary agreements requiring the strongest proof of authority by the one making it to bind a corporate employer"). Although widespread knowledge that the Bank had never laid off an employee except for criminal conduct might prompt the legitimate belief that employment at the Bank was relatively secure, it cannot be considered competent proof, let alone "strong proof," Gregory, 27 Mass. App. Ct. at 1171, 540 N.E.2d at 695, that any _______ Bank employee had a lifetime employment contract. Absent evi- dence of any lifetime employment contract with the Bank at any level under any circumstances we must conclude that a rational factfinder could not reasonably find that lifetime employment contracts with the Bank were customary. Although Goldman failed to generate a trialworthy issue as to whether Beaulieu possessed apparent authority to offer lifetime Bank employment, we must still consider whether any officer, with authority to bind the Bank, subsequently ratified ____ 21 Beaulieu's unauthorized offer of lifetime employment. See ___ Restatement (Second) of Agency 82 (1958); 28 A.L.R. at 938-40; ______________________________ Rydman, 373 Mass. at 855, 366 N.E.2d at 764; Simonelli, 334 Mass. ______ _________ at 441, 137 N.E.2d at 672. Goldman attests that the concept of lifetime employment was reinforced by various supervisors throughout his tenure at the Bank. Ratification is not established, however, unless the subsequent assurances were made by one with actual or apparent authority to bind the Bank to a lifetime employment contract. See Rydman, 373 Mass. at 855, 366 N.E.2d at 764; Restatement ___ ______ ___________ (Second) of Agency 93 cmt. c (1958). As the record contains no __________________ evidence that any supervisor who represented that Goldman was employed for life had actual or apparent authority to determine the terms of Goldman's employment contract, much less bind the Bank to a lifetime contract, no trialworthy issue was raised relating to the ratification claim.11 As Goldman generated no trialworthy issue relating to the lifetime employment contract claim, summary judgment was proper. Affirmed. Affirmed. ________ ____________________ 11The Bank's pre-1989 practice of not discharging employees except for criminal conduct is entirely consistent with universal at-will employment and does not constitute affirmance of a lifetime contract. See Restatement (Second) of Agency 93 ___ ________________________________ (1953) ("affirmance can be established by any conduct of the purported principal manifesting that he consents to be a party to the transaction, or by conduct justifiable only if there is ratification"). 22