Jimmie E. WOODS, Plaintiff,

v.

FRICTION MATERIALS,
INC., Defendant.

Civ. A. No. 90–11389–WF.

United States District Court,
D. Massachusetts.

Oct. 1, 1993.

900

Frederick T. Golder, Lynnfield, MA, for plaintiff.

Richard W. Gleeson, Boston, MA, James A. Smith, Paul R. Beshears, Atlanta, GA, for defendant.

### MEMORANDUM AND ORDER

WOLF, District Judge.

Defendant Friction Materials, Inc. ("FMI") has moved for summary judgment on Plaintiff Jimmie E. Woods ("Woods") claims of discrimination on the multiple bases of race,

age and physical disability[1] in defendant's refusal to rehire him under the Federal Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), Mass.Gen.L. ch. 151B ("ch. 151B"), and the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 93 §§ 102, 103 ("MCRA"). Woods seeks reinstatement, back pay, injunctive relief, punitive damages and attorney fees. For the reasons stated below, defendant's motion for summary judgment must be allowed.

## I. *FACTS*

The following facts are undisputed unless otherwise noted. Defendant FMI is a wholly owned subsidiary of Echlin Inc. ("Echlin"), and is engaged in the production of brake blocks for trucks and buses and brake disc pads for automobiles. On October 17, 1986, Echlin acquired a group of small, privately owned, interrelated companies in Lawrence, Massachusetts, which were engaged in the manufacture of brake parts for a variety of motor vehicles. Echlin created the subsidiary FMI to make the acquisition. Affidavit of Patrick T. Healey ("Healey Aff.") at 1–2. At the time of acquisition, FMI had many business problems, foremost of which were obsolete and poorly maintained plant machinery, a production system which was unresponsive to consumer demand, and a large inventory of finished product rendered unsalable due to its poor or inferior quality. *Id.* at 2–3.

In an attempt to improve this situation, Echlin instituted a number of changes at FMI. On February 6, 1987, Echlin management removed FMI's President Carmen Matti and Manufacturing Manager Don O'Hare, both caucasian males, because of dissatisfaction with their work and the performance of FMI. On February 9, 1987, Patrick T. Healey was appointed Division Manager of FMI, the top managerial position. The Superintendent, Elvin Valentin, continued in his position under Healey. Healey Aff. at 2.

Plaintiff Jimmie Woods is an African-American man, now fifty-four years of age, having been born on February 20, 1939, and is handicapped within the meaning of the relevant laws. Complaint at ¶¶ 8–10. Woods began his employment with the predecessor of FMI in February 1961 and continued in the employ of FMI until 1989. Affidavit of Jimmie E. Woods ("Woods Aff.") at ¶ 1. In 1968, Woods was promoted to foreman, and in 1970 to supervisor. Woods Aff. at ¶¶ 6–7.

Once FMI took over, the demands placed upon personnel increased significantly. Woods acknowledges that when he "was supervisor for the old company, it wasn't as complicated as supervisor for [FMI]," and that FMI's expectations of employees were generally greater. Deposition of Jimmie Woods ("Woods Dep.") at 27–28, 33. Woods avers that he never received any oral or written warnings as to his performance, and that the only written evaluation he had ever received from FMI, dated November 1987, and presented to him by Valentin, gave him an overall evaluation between competent and outstanding. Woods Aff. at ¶¶ 47, 50, 52. This assertion is, however, contradicted by the testimony of Woods, in which he states that he had a second formal performance evaluation with Valentin. Woods Dep. at 47. According to Woods, the second evaluation consisted of a ten to fifteen minute discussion with Valentin sometime in 1988, in which he was informed that he would not be receiving a raise because both Valentin and his supervisor, Manufacturing Manager Ray Shaffer, believed that Woods was not performing up to his capability, and that he needed to improve in the areas of scheduling, and getting along and communicating with others. *Id.* at 47, 49–52, 54–55.

Woods states that there were twelve foremen that FMI inherited and that all of those who are African-American, except for Woods and Paul Harris, were terminated. Woods Aff. ¶¶ 44–45. While this point does not appear to be disputed, Woods has not identified how many of the twelve foremen were African-American. FMI focuses only on the foremen within the block making department where the plaintiff worked. *Id.* ¶ 44. On

---

1. While Woods advances claims on these three bases, the majority of his arguments and the bulk of his evidence relate to the claim of race discrimination.

October 17, 1986, the acquisition date, FMI states that it had four production foremen in the block making department: Woods, then age 45; Richard Bond, a caucasian male, then age 45; Paul Harris, an African–American male, then age 65; and Peter Lane, an African–American male, then age 50. Healy Aff. at 4. Bond was terminated in September 1987 for poor performance,[2] and Lane was demoted to a non-supervisory position. *Id.* Harris evidently continued in his supervisory position. Thus, of the three men other than Woods who held these positions when FMI took over, two were African–Americans, and one was caucasian. Subsequently, the sole caucasian was fired, one African–American was demoted, and one African–American retained his position.

In October 1988, as the result of injuries sustained in a non-work related automobile accident which left him with a handicap within the meaning of applicable law, Woods was forced to take an extended medical leave of absence. Woods Dep. at ¶ 19. Woods' medical leave of absence expired in late February of 1989, but he remained unable to return to work as a result of the continuing impact of his injuries. Under the personnel policies of FMI, employees who fail to return to work upon the expiration of their leaves of absence, are terminated, notwithstanding the ongoing nature of the ailment. Healey Aff. at 10. Accordingly, after his sick leave and accrued vacation time were exhausted,[3] Woods' employment was terminated by FMI by a letter from Employee Relations Manager A. Arthur McKew, dated February 28, 1989. Woods Dep. at 18. McKew asserts that FMI's termination of Plaintiff Woods "was consistent with how it had treated other like-situated employees." Affidavit of A. Arthur McKew ("McKew Aff.") at 2.

In late 1989, FMI began interviewing candidates for production foremen of a new line it intended to start. Woods and approximately seventy-four others applied for the four positions. McKew Aff. at 2. Out of this group, eight candidates were selected for interviews with McKew and the two Production Superintendents, Warren Kappeler and Garnet Wilson.[4] *Id.* McKew states that he "decided to include Mr. Woods in this group because of his prior employment with FMI." *Id.* McKew also states that following the interviews both Kappeler and Wilson told him that they had found Woods unacceptable and recommended that he not be offered a position. *Id.*

Kappeler and Wilson evaluated Woods, as they did each applicant, on manufacturing and production knowledge and comprehension, supervisory skills, and general demeanor. Affidavit of Warren Kappeler ("Kappeler Aff.") at 1; Affidavit of Garnet Wilson ("Wilson Aff.") at 1. Kappeler and Wilson found Woods to be weak in both his lack of understanding of production processes, and in his supervisory skills. In fact, Kappeler and Wilson each state that they rated Woods' supervisory skills the poorest of all the candidates interviewed at the time. Kappeler Aff. at 2; Wilson Aff. at 2. In the estimation of both Kappeler and Wilson, these weaknesses outweighed any strengths Woods possessed, such as his experience and previous employment with FMI. Kappeler Aff. at 2; Wilson Aff. at 2. Accordingly, McKew informed Woods by mail that a decision had been made not to rehire him. McKew did so despite his belief that Woods, while not the best candidate, could have been able to fill one of these positions. Deposition of A. Arthur McKew at 39, Exhibit "G" to Woods Aff. Shortly thereafter, the four openings were filled by younger, non-handicapped, caucasians. Woods Aff. at ¶ 35. Plaintiff admits that he does not know the qualifications of the individuals ultimately hired by FMI. Woods Dep. at 97.

On or about March 19, 1990, Woods filed charges of discrimination with the Equal Employment Opportunity Commission and

---

2. Bond was a foreman in both the block making and finishing departments. Healey Aff. at 4.

3. Under FMI's personnel policies, an employee on a leave of absence is entitled to eight weeks at full salary, thirteen weeks at one-half salary, and any unused vacation. Failure to return at the end of this period results in termination. Affidavit of A. Arthur McKew at 1. Woods had used his eight weeks of full pay earlier in 1988, following his early March collision. *Id.* at 2.

4. Woods denies having had a personal interview with McKew. Woods Aff. at ¶ 39.

the Massachusetts Commission Against Discrimination. On May 7, 1990, Woods filed a complaint commencing this action in the Superior Court of the Commonwealth of Massachusetts for the County of Middlesex. Subsequently, the case was removed to this court.

## II. *DISCUSSION*

### A. *The Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

 In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Id.; Medina–Munoz*, 896 F.2d at 8; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

### B. *Plaintiff's Claims Under the ADEA and Mass.Gen.L. ch. 151B.*

 Because Woods does not offer direct evidence of age, race, or handicap discrimination, his ADEA and Mass.Gen.L. ch. 151B claims must both be examined under the three step analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1117 (1st Cir.1993) (in absence of direct evidence of age discrimination, ADEA claim is governed by burden-shifting set forth in *McDonnell Douglas*); *White v. University of Massachusetts at Boston*, 410 Mass. 553, 557, 574 N.E.2d 356 (1991) (same with respect to Mass.Gen.L. ch. 151B); *McKenzie v. Brigham & Women's Hospital*, 405 Mass. 432, 434–35, 541 N.E.2d 325 (1989) (same). Under the burden-shifting framework set forth in *McDonnell Douglas* the plaintiff must first present a *prima facie* case of discrimination. Once the plaintiff has established his *prima facie* case, the burden shifts to the defendant, who must then proffer a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant articulates such a reason, it is then incumbent upon the plaintiff·to prove that the reason offered is a pretext for legally prohibited discrimination. At all times, the burden of ultimate persuasion rests with the plaintiff. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——–——, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993); *Medina–Munoz*, 896 F.2d at 9.

### i. *Plaintiff's Prima Facie Case*

 The elements of a *prima facie* case which the plaintiff must present evidence adequate to reach a jury on are: (1) that he is a member of the pertinent protected class; (2) that he was able to meet the employer's legitimate job performance expectations; (3) that he experienced adverse employment action; and (4) that after the rejection of the plaintiff the employer continued to seek applications by persons with qualifications roughly equivalent to those of the plaintiff. *Goldman*, 985 F.2d at 1117. As the Court of Appeals for the First Circuit has noted, "a complainant's initial burden of establishing a

*prima facie* case of disparate treatment is not onerous." *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 70 (1st Cir.1984), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

■ Woods has successfully presented a *prima facie* case. He is a member of three protected classes on the basis of race, age, and as a handicapped person within the meaning of applicable law. His long experience in the industry and history of largely favorable reviews, and McKew's opinion that he was qualified to fill one of the openings, has created at least a genuine issue as to his ability to meet the employer's legitimate expectations. Woods was denied a supervisory position by FMI. In addition, defendant has not offered evidence to remove from dispute the issue whether he was about as qualified as the individuals ultimately hired.

### ii. *Defendant's Articulated Nondiscriminatory Reason*

■ FMI has met its burden of production by articulating a legitimate, nondiscriminatory reason for its adverse employment action. Specifically, FMI asserts that it did not rehire Woods because he was not qualified for the position and, or in the alternative, that those hired were more qualified. FMI, however, has offered evidence only as to the plaintiff's qualifications; it has not offered the evidence which would be necessary for a factfinder to compare Woods' qualifications with those of the successful applicants.

FMI supports its claim that Woods was not qualified for the job by pointing to his perceived weaknesses, particularly in terms of supervisory skills. Kappeler Aff. at 2; Wilson Aff. at 2. FMI claims that the plaintiff's qualifications were assessed in light of the evolving nature of FMI's demands of its employees. As Echlin began to modernize FMI's production control systems, the demands made upon its supervisors increased. Additional production lines were put in place, quality control was emphasized, and a "just-in-time" production control system introduced. Healey Aff. at 6–8. As a result, FMI foremen were called upon to discharge greater responsibilities. More specifically, FMI states that:

> This [new FMI] system required considerably more product scheduling by the Foremen. In essence, before the production control system was introduced, the Foremen typically had simply run large quantities of one particular product per shift and had to be concerned with setting up the machinery, coordinating the raw materials, and assigning the workforce only once per shift. Consequently, [sic] the Foremen had to plan for, coordinate and implement changes in the machinery, raw material flow, and workforce assignments several times during a shift. In essence, FMI went from a relatively simple operation to a complex manufacturing system with a production schedule and pre-planning requirements.

Healey Aff. at 8.

FMI also claims that one effect of the increase in demands upon FMI foremen was that vocational failings previously masked were revealed. For example, Healey explains that when a second production line was put into place, the foremen in general, and Woods in particular, could no longer rely on Valentin for assistance, and certain weaknesses became manifest. With respect to the plaintiff, Healey claims that Woods "had a great deal of difficulty in planning for and implementing the coordination of the machinery, raw materials, and workforce assignments necessary to produce the product mix and quantity required of his shift." Healey Aff. at 9. In fact, in the performance evaluation report of Woods for the fall of 1988 which, as a result of Woods' accident was never formally delivered, *id.* at 10, Healey and Shaffer evaluated Woods' overall performance in the second to lowest category, placing him in the lowest grade with regard to enforcement of company policies, acceptance of responsibility, and decision making, and setting forth a performance improvement plan for Woods while on probationary status. *Id.* at 9–10 & Exhibit "C" (Copy of 1988 Performance Appraisal Report for Woods).

Although McKew felt Woods could have filled one of these positions, FMI's stated corporate and official position was that Woods, despite his experience and knowl-

edge, was not qualified to serve as a supervisor in the retooled FMI and, in any event, was not as well qualified as the individuals awarded the jobs. Thus, FMI has presented adequate evidence that it had a legitimate, business reason for its decision not to rehire Woods.

iii. *Pretext and Discriminatory Motive*

█ Accordingly, to survive FMI's motion for summary judgment, Woods must "elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive: [impermissible] discrimination." *Medina–Munoz*, 896 F.2d at 9; *see also Mesnick v. General Electric Co.*, 950 F.2d 816, 825 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to the ultimate question: whether the plaintiff has [proffered evidence adequate for a reasonable jury to find] 'that the defendant intentionally discriminated against [him]' because of his race," age, or handicap. *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2749 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

a. *Pretext*

█ Plaintiff has not offered sufficient evidence to permit a reasonable factfinder to conclude that FMI's stated reasons for not hiring him were a pretext for anything, let alone for an unlawful, discriminatory motive. It is possible that on the present record a reasonable factfinder would determine Woods was qualified to hold one of the new supervisory positions on the basis of his experience in the industry, and McKew's opinion that Woods was qualified for one of the positions. Deposition of A. Arthur McKew at 39, Exhibit "G" to Woods Aff. There is not sufficient evidence, however, to prove that he was better qualified than the other, successful candidates, or that FMI's articulated reasons for not hiring him were "obviously weak or implausible." *Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st

Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). In such circumstances, the Court of Appeals for the First Circuit has held that a plaintiff failed to present a triable issue of pretext. *Id.* Therefore, Woods has failed to present adequate evidence that the defendant's stated reason for its decision was a pretext for anything, as he must if he is to prevail on defendant's motion for summary judgment. *Id.*

b. *Discriminatory Motive*

More importantly, even if there were adequate evidence to support a finding that FMI's explanation for its decision was pretextual, there is not sufficient evidence to permit a finding that the pretext was intended to hide an illegal, discriminatory motive. The Court of Appeals for the First Circuit has consistently held that when confronted with a motion for summary judgment it is insufficient for a plaintiff merely to place in dispute whether the defendant's stated reason for its conduct was its true reason. *See, e.g., Morgan v. Massachusetts General Hospital*, 901 F.2d 186, 191 (1st Cir.1989); *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987); *Gray v. N.E. Tel. and Tel. Co.*, 792 F.2d 251, 255 (1st Cir.1986); *White v. Vathally*, 732 F.2d 1037, 1042 (1st Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). Rather, as the Court of Appeals for the First Circuit has indicated, "the relevant question is whether the given reason was a pretext for discriminatory intent." *Dea*, 810 F.2d at 15.

The Supreme Court has recently validated the view of the Court of Appeals of the First Circuit. In *St. Mary's Honor Center*, the Supreme Court held that "nothing in the law would permit [courts] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its actions was not believable." —— U.S. at ——, 113 S.Ct. at 2751.

Woods contends that he is entitled to try his case because there is evidence of discriminatory motivation here in the form of more favorable treatment of certain employees; racist remarks by his supervisor; encourag-

ing remarks by one interviewer; and statistical evidence regarding the termination of African–American supervisors at FMI. As is discussed below, however, some of Woods' claims are not supported by the evidence, and the admissible evidence of unlawful discrimination is insufficient to survive FMI's motion for summary judgment.

In the first instance, Woods claims that other, non-African-American, employees of FMI were treated better than he was with respect to disability leave. However, plaintiff's vague claims in this area are not supported by the evidence. Woods points to James J. Rydle, Jr., a caucasian male supervisor, as an individual allegedly treated differently by FMI. Woods claims that in his experience with FMI, an employee out on disability would, upon recovery, be restored to his or her former position. Woods Aff. at ¶ 25. Woods claims that Rydle, after having been out of work for a not identified number of months with a diabetes related ailment, was allowed to return to his former position. *Id.* at ¶ 26.

McKew asserts, however, that the incident referred to by Woods took place prior to the acquisition of the company by FMI, with Rydle missing approximately seven months of work in 1985 due to a foot ailment caused by diabetes. Affidavit of A. Arthur McKew dated August 26, 1992 ("McKew Aff. II") at 1. Upon his recovery, evidently under the personnel policies of FMI's predecessor, P.T. Brake Company, Inc., Rydle returned to his position. *Id.* Subsequently, following the acquisition of P.T. Brake Company by FMI, Rydle took an extended leave of absence and, like Woods, was treated in accordance with the FMI personnel policy. Specifically, McKew states that Rydle began a medical leave of absence on December 27, 1988, and that during this absence he was paid his accrued vacation, eight weeks at full pay, and thirteen weeks at one-half salary. At the time these payments expired on June 9, 1989,

Rydle, who was unable to return to work, was terminated. *Id.*

Woods has offered no evidence to controvert these assertions. Rather, the statements made in his affidavit with respect to Rydle appear to be a result of confusion as to the relevant dates and the then prevailing personnel policies. In view of defendant's specific response, Woods' general assertions are insufficient to place in genuine dispute the fact that Rydle, a caucasian male in a managerial position, was treated in the same manner as Woods and terminated pursuant to FMI's standard policy. *See, e.g., Medina–Munoz,* 896 F.2d at 8 (to demonstrate existence of genuine material fact, nonmovant cannot rely "merely upon conclusory allegations"). Thus, Rydle's experience tends to support FMI's position rather than provide evidence of a discriminatory motive concerning Woods.

In addition, Woods points to Jose Messet as an individual allegedly treated differently than he was by FMI. Messet, apparently, continued to receive pay while on medical leave for a period of time in excess of that granted to the plaintiff, and was not terminated. Woods Dep. at 103–04. FMI does not contest this. However, Woods acknowledges that, in contrast to himself, Messet was out as a result of an occupational injury, and so was not similarly situated. *Id.*[5]

Apart from Rydle and Messet, Woods knows of no other FMI employees who he contends were treated differently than himself as far as leave of absence and pay during leave of absence. *Id.* at 104. In order to present, or contribute to the existence of, a genuine issue of material fact on this basis, Woods would have to present specific evidence of similarly situated employees who were not terminated at the end of their leave of absence period. Woods has failed to do so.

Next, plaintiff asserts that a discriminatory motive may be inferred from racist

---

5. FMI has not offered evidence of its personnel policy with respect to disabilities resulting from work-related injuries, but implies it is different from the policy related to non-work-related disabilities, such as Woods', and that this difference explains the treatment given to Messet. It is not essential to resolve this ambiguity in the record because the Messet matter is not, alone or in the context of all of the other evidence, sufficient to defeat defendant's motion for summary judgment.

remarks made by Woods' immediate supervisor, Elvin Valentin.[6] Woods Aff. ¶ 36; Woods Dep. at 136. However, the discriminatory attitude indicated by such remarks could not have influenced FMI's decision not to rehire Woods because it is undisputed that Valentin had been transferred to another Echlin subsidiary, located in Prattville, Alabama, in early 1989, months before Woods was considered for rehire. McKew Aff. at 2. It is well-settled that the "biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Medina–Munoz*, 896 F.2d at 10. Thus, Valentin's remarks do not constitute, or contribute to, the evidence Woods needs to survive defendant's motion for summary judgment.

Woods also asserts that during his interview, Wilson said to him, "You are the kind of guy I would like to have on my team." Woods Dep. at 76. On its face, this statement is inconsistent with the ultimately negative evaluation which plaintiff received from Wilson. Thus, this statement may suggest that Woods was regarded by one interviewer as qualified. As explained earlier, however, this alone is insufficient to prove pretext in the context of this case, *Villanueva*, 930 F.2d at 131, and is certainly inadequate to prove that any possible pretext was used to mask an unlawful motive.

 Finally, the plaintiff attempts to present statistical evidence regarding the firing of other African–American production foremen in order to support an inference of discriminatory motivation with regard to himself. As described earlier, Woods states that there were twelve foremen that FMI inherited at the time of its acquisition, and that all of those who are African–American, except for Woods and Paul Harris, were terminated. Woods Aff. ¶¶ 44–45. Statistical evidence demonstrating "disparate treatment by the employer of members of a protected class" can be highly probative in showing pretext or discriminatory motive. *Mesnick*, 950 F.2d at 824; *see also Goldman*, 985 F.2d at 1119 n. 5. However, "[t]he probative

worth of statistical testimony must be evaluated in light of the methodology employed, the data available, and the factual mosaic unique to the case at hand." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 156 (1st Cir.1990) (quoting *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1342 (1st Cir.1988)). Here, Woods has neither presented evidence as to the racial mix of the twelve foremen to which he refers, nor has he indicated how many non-African-American foremen were terminated. Thus, a meaningful comparison cannot be made. *See Goldman*, 985 F.2d at 1119 n. 5 (statistical evidence not probative of discrimination where information necessary for its interpretation is not presented).

The inadequacy of Woods' proffered statistical evidence is indicated by the Court of Appeal's for the First Circuit's decision in *Connell v. Bank of Boston*, 924 F.2d 1169 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991). In *Connell*, the plaintiff in an age discrimination case provided data as to the percentage of the protected class terminated in relation to the number of all those terminated, but did not offer evidence to establish the number of members of the protected class within the total work force. *Id.* at 1177. The Court of Appeals found that he had failed to present evidence sufficient to support a finding that employees within the protected class had been terminated at a disproportionate rate. *Id.* In explaining this conclusion, the Court of Appeals emphasized that, "Without more, plaintiff's affidavits provide at best a small sample of employment data, without any showing of the statistical relevance of the sample, and a series of vague statements and conjectures." *Id.* at 1178. This observation is equally applicable to the instant case.

The evidence in the present matter is readily distinguishable from that in *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104 (1st Cir. 1989). There, "although clumsily handled," 872 F.2d at 1114, the plaintiff presented evidence that out of seventeen salaried workers in the protected class, thirteen were termi-

---

6. Plaintiff asserts that Valentin told Woods that he resembled an ape or monkey, and "would point to a black doll he kept in his desk, and say to the other employees that the black doll was Jim (meaning me)." Woods Aff. at ¶ 36.

nated within a nine month period by the employer. *Id.* Thus, a total of 76% of those in the protected class were terminated. *Id.*

As indicated earlier, in the present case, there is no information as to the total number of African–American foremen. Of the four foremen for whom specific information is provided, one caucasian was terminated, one African–American was demoted, and the plaintiff was terminated in accordance with an established personnel policy. The only foreman in plaintiff's unit who was not subject to an adverse action was Paul Harris, an African–American. In these circumstances, the evidence is, at best, too conjectural to raise a genuine dispute as to discriminatory motive. *See Goldman,* 985 F.2d at 1119; *Mesnick,* 950 F.2d at 822; *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989) (evidence presented by party opposing summary judgment cannot be problematic or conjectural).

This court is obligated to look at evidence of discrimination "not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff." *Mesnick,* 950 F.2d at 824. In the instant case, however, even viewed in the light most favorable to him, Woods has failed to present evidence such that a reasonable jury could find that the reasons proffered by FMI for its refusal to rehire Woods were a pretext for illegal discrimination. Thus, FMI's motion for summary judgment on plaintiff's ADEA and Mass.Gen.L. ch. 151B claims must be granted.

### C. *Plaintiff's Claim Under MCRA*

■ As the Massachusetts courts have found Mass.Gen.L. ch. 151B, the Massachusetts employment discrimination statute, to be the exclusive remedy for employment discrimination complaints, the plaintiff's claim under the MCRA is pre-empted. *See, e.g., Mouradian v. General Electric Co.,* 23 Mass. App.Ct. 538, 543, 503 N.E.2d 1318, *rev. denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987) (holding that employee who had failed to bring timely age discrimination complaint under ch. 151B was precluded from bringing same complaint under MCRA); *Sereni v. Star Sportswear Mfg. Co.,* 24 Mass.App.Ct.

428, 431, 509 N.E.2d 1203, *rev. denied,* 400 Mass. 1107, 513 N.E.2d 1289 (1987) (holding that employee who failed to file administrative age discrimination complaint as required by Mass.Gen.L. ch. 151B could not bring an MCRA claim); *Melley v. Gillette Co.,* 19 Mass.App.Ct. 511, 513–14, 475 N.E.2d 1227 (1985), *aff'd,* 397 Mass. 1004, 491 N.E.2d 252 (1986) (rescript) (refusing to create new common law claim in face of comprehensive existing statutory scheme of Mass.Gen.L. ch. 151B and noting that the Massachusetts Supreme Judicial Court disfavors "creation of duplicative remedies"); *Titcomb v. Boston Safe Deposit & Trust Co., Inc,* No. 92–6585, slip op. at 11 (Mass.Super.Ct. June 9, 1993) (holding that Mass.Gen.L. ch. 151B provides exclusive remedy for employment discrimination claims).

As explained in *Bergenson v. Franchi,* 783 F.Supp. 713 (D.Mass.1992), the adequacy of the remedies afforded under Mass.Gen.L. ch. 151B, the efficiency of a uniform legislative remedy, the importance of giving effect to the procedural prerequisites of Mass.Gen.L. ch. 151B, and the absence of clear guidance from the Massachusetts Supreme Judicial Court, all support the finding that Mass. Gen.L. ch. 151B is the exclusive state law remedy for employment discrimination complaints. *Id.* at 718–21. Having adopted this reasoning in the past, *Lewis v. Gillette Co.,* No. C.A. 90–12257, 1993 WL 291771, at *10 (D.Mass. July 21, 1993), the court finds no reason to deviate from it here. *See also Lajoie v. General Electric Co.,* No. 91–13259, slip op. at 14–15, 1993 WL 343678 (D.Mass. Aug. 17, 1993). Summary judgment for the defendant must, therefore, also be entered on this claim.

### III. *ORDER*

For the foregoing reasons, defendant's motion for summary judgment on all counts is hereby ALLOWED.