**Deborah C. VINGI, Plaintiff**

v.

**STATE of Rhode Island and Lincoln Almond, Governor, Defendants.**

**No. 94–466B.**

United States District Court,
D. Rhode Island.

May 20, 1997.

---

Deborah C. Vingi, North Providence, RI, pro se.

Ina P. Schiff, Providence, RI, for Plaintiff.

James R. Lee, Linda D. Duva, Atty. Gens. Office, Providence, RI, for Defendants.

## ORDER

FRANCIS J. BOYLE, Senior District Judge.

After hearing argument on the Plaintiff's objections to Magistrate Judge Lovegreen's Report and Recommendation dated May 24, 1996, recommending the defendants' motion for summary judgment be granted on all counts of the complaint, and considering the materials submitted in support thereof, this court adopts in its entirety the thorough and well-reasoned Report and Recommendation as the findings and judgment of this court. IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Presently before me is the defendants', State of Rhode Island and Rhode Island Governor Lincoln Almond (collectively "the State"), motion for summary judgment pursuant to Fed.R.Civ.P. 56. The plaintiff, Deborah C. Vingi ("Vingi"), has instituted this employment discrimination action under both state and federal law claiming that the State discriminated against her in denying her application for entry into the Rhode Island State Police Training Academy on the basis of her gender, purported sexual orientation, familial relationships and ethnicity. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c). A hearing was held on April 23, 1996. After listening to the arguments of counsel and examining the memoranda submitted, I recommend that the State's motion for summary judgment be granted on all counts.

### Facts and Background

The essential facts are not in dispute. Since 1982, Vingi has been employed as a radio dispatcher by the Rhode Island Department of Environmental Management (DEM), Division of Enforcement. This Division is the law enforcement branch of DEM responsible for the enforcement of environmental laws and regulation.

Vingi first applied to the Rhode Island State Police Academy ("Academy") in 1983, but no Academy was held for that year. In 1985, Vingi reapplied passing the agility test, but failed the eye examination. In January, 1986, Vingi applied once again, passing the agility test, physical examination, initial psychiatric examination and the first interview, but failed to pass the final review board. According to Vingi, the state's rejection of her 1986 candidacy stemmed from a background investigatory report "which contained inaccurate and derogatory information about Plaintiff's sexual orientation as well as other conclusory statements concerning Plaintiff's family, alleged connections to organized crime, and interactions of certain of Plaintiff's siblings with the criminal justice system, while omitting positive information about plaintiff." Pl.'s Amended Verified Compl. ¶ 15 ("Complaint").

In June, 1989, undeterred by her prior failings, Vingi reapplied for the Academy passing all portions of the application procedure, which for the first time included a written examination, but again failed to pass the final review board. Vingi submitted another application in July, 1991, and again, sat for the Law Enforcement Candidate Record Examination ("LECRE"). By letter, Vingi was informed that the lowest passing grade was a score of 93, out of a possible 124, and that consequently, having received a score of 90, she would not be further processed.

In October, 1992, Vingi filed a charge of discrimination with the Rhode Island Commission on Human Rights ("RICHR") and the United States Equal Employment Oppor-

tunity Commission ("EEOC"). Essentially, the charge alleged that the 1991 LECRE'S 93 cutoff score was arbitrary having an adverse and discriminatory impact on women and minorities. On January 31, 1994, the RICHR determined that the charge contained no probable cause and concluded its investigation. Five months later, the EEOC likewise dismissed her charge.

Following her charge to the EEOC and RICHR, Vingi reapplied to the Academy in 1993, successfully completing the agility test and oral interview, but again was not selected for the Academy. It is unclear whether Vingi sat for the LECRE. Vingi contends that in March, 1994, she was interviewed by state police investigators and asked about her working relationships with coworkers at DEM who had been previously interviewed in connection with a background investigation conducted as part of her 1986 application. Additionally, investigators inquired about her answering "no" to a 1993 application question, which asked whether the applicant had ever been a plaintiff in a civil suit, despite her prior charge to the EEOC and RICHR in 1992. In response, Vingi related that she understood the question as concerning only actual litigation, not a charge with an administrative agency.

Finally, on September 5, 1994, Vingi commenced this six count action. In Count I, Vingi contends that the 1991 LECRE had a disparate and discriminatory impact on women in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Count II alleges that the background investigations conducted by the State denied her equal employment opportunity in violation of Title VII based on ethnicity, gender, and familial associations. Count III contains federal equal protection and Title VII claims alleging that Vingi was excluded from the 1994 Academy, while a male candidate, allegedly receiving a score of less than the 93 cutoff, was admitted. In Count IV, Vingi contends that she was not selected to the 1994 Academy class in retaliation for filing administrative charges with the RICHR and EEOC in 1992. Vingi alleges in Count V that she was treated differently than other male applicants, in violation of the federal equal protection clause and Title VII, based on unsubstantiated allegations of her sexual orientation, hosting of "wild parties" and public intoxication. Finally, Count VI alleges violations of Rhode Island's Equal Protection Clause, Fair Employment Practices Act and Civil Rights Act of 1990.

During oral argument on this motion, Vingi dropped all claims of discrimination based on familial associations, ethnicity and sexual orientation. Additionally, she is no longer pressing Count III.

I. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir.1992).

Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the onus

falls upon the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); *see Goldman*, 985 F.2d at 1116; *Lawrence*, 980 F.2d at 68; *Garside*, 895 F.2d at 48 ("[A] 'genuine issue' exists if there is 'sufficient evidence supporting this claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.' " (quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976))). To oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson*, 477 U.S. at 256. Moreover, the evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick*, 950 F.2d at 822 (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Thus, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman*, 985 F.2d at 1116 (citing *Anderson*, 477 U.S. at 249).

## II. *Law Enforcement Candidate Record Examination.*

Vingi contends initially that the 1991 LE-CRE had a disparate and adverse impact on women. Specifically, Vingi points out the State has conceded that because the top 500 scores on the LECRE failed to produce sufficient numbers of women and minorities, this group or "banding" was expanded to 793 candidates eligible for further processing. Moreover, Vingi contends that the LECRE never underwent a transportability study to establish its validity. While conceding that the initial banding of 500 applicants was expanded to 793, the State counters that the LECRE had no adverse or disparate impact on women at either grouping. Consequently, the state contends that without first establishing a disparate impact on women, Vingi can not attack the validity of the examination.

### A. Applicable Law.

■ As an initial matter, neither party has addressed whether the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), signed into law November 21, 1991, applies to the present case. However, there is no dispute that Vingi sat for the 1991 LECRE and received her score prior to the Act's enactment. In *Landgraf v.. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the United States Supreme Court grappled with whether § 102 of the 1991 Civil Rights Act, amending a portion of Title VII, should be applied retroactively. In declining to apply the statute retroactively, the Supreme Court noted the general presumption against retroactive application to events preceding a statute's enactment. *Id.* 114 S.Ct. at 1501. Because there appears to be no justification to depart from this general prohibition, the law in effect prior to the 1991 Act will be utilized to examine Vingi's claims.

### B. Disparate Impact.

■ "It has long been understood that discrimination, whether quantitatively or qualitatively, is not always a function of a pernicious motive or malign intent. Discrimination may also result from otherwise neutral policies and practices that, when actuated in real-life settings, operate to the distinct advantage of certain classes of individuals." *E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 600–01 (1st Cir.1995). Title VII embodies such a reality in the concept of disparate impact discrimination. In practical terms, a disparate impact claim charges that a facially neutral employer practice or examination led to a discriminatory impact on a particular group and that the test or practice cannot be justified as a business

necessity. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ The First Circuit has recently articulated the three elements that a plaintiff must demonstrate to make out a prima facie disparate impact claim:

First, the plaintiff must identify the challenged practice or policy, and pinpoint the defendant's use of it. Second, the plaintiff must demonstrate a disparate impact on a group characteristic, such as (gender), that falls with the protective ambit of Title VII. Third, the plaintiff must demonstrate a causal relationship between the identified practice and disparate impact.

*E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 601 (1st Cir.1995) (citations and footnote omitted). Once the plaintiff establishes a prima facie case, the burden of *production* shifts to the employer. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990) ("prima facie case serves only to shift the burden of production to the employer, leaving the burden of persuasion intact"). The defendant may then either attack the plaintiff's prima facie case directly or, alternatively, acknowledge the plaintiff's showing, but demonstrate that the "challenged practice is job-related and consistent with business necessity." *Steamship Clerks Union*, 48 F.3d at 602.

■ In the present case, Vingi does not dispute the following relevant statistics concerning the 1991 LECRE: out of the 2,923 applicants who sat for the LECRE, 793(27%) received a score of 93 or better; out of the 323 women who sat for the LECRE, 88 (27.2%) obtained a score of 93 or better; and out of the 2600 men who sat for the LECRE, 705 (27.1%) received a score of 93 or better. More importantly, Vingi does not take issue with the fact that the top 500 or so scores for the LECRE, the number constituting the initial banding, were comprised of 48 women (14.8% of the women who sat for the exam) and 434 men (16.6% of all men).

To support her claim, Vingi clings to a position paper submitted by the State to the RICHR, in which the State allegedly admits that the 1991 LECRE had a disparate impact on women:

Initially, it was the intention of the Rhode Island State Police to take those with the top 500 scores on the written exam, provided they passed, for further processing, to arrive at 35 candidates who would ultimately be placed in the 1992 Academy. When this pool did not produce sufficient numbers of women and minorities, the pool was increased by 293 candidates, in other words, the top 793.

Vingi also asserts that the LECRE was never validated. However, Vingi has failed to demonstrate that a genuine issue of material fact remains over whether the LECRE had a disparate impact on women and, consequently, the LECRE's validity can not now be challenged.

■ To demonstrate a disparate impact, a plaintiff may utilize "statistical evidence revealing a disparity so great that it cannot reasonably be attributed to chance." *N.A.A.C.P. v. Town of East Haven*, 70 F.3d 219, 225 (2nd Cir.1995); *see Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 ("gross statistical disparities ... may in a proper case constitute prima facie proof of a pattern of discrimination."). That is, statistical disparities must be sufficiently substantial thereby raising an inference of causation. *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 995, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Under the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D), a selection rate among women applicants of greater than 80% of the group with the highest selection rate is strong evidence of a lack of a disparate impact. Clearly, the undisputed statistical evidence at either banding unequivocally demonstrates that the 1991 LECRE failed to have a disparate impact upon women. At the initial 500 banding, 16.6% of the men sitting for the 1991 LECRE received a score of 93 or better, while 14.8% of the women received the same score. At the 793 banding, the percentages are 27.2% for women and 27.1% for men.

Moreover, Vingi's reliance on the State's position paper is clearly misplaced. Viewed

in the context of a lack of substantial statistical disparity in the initial banding, the position paper evidences a concern by the State over the *total* number of women in that grouping. The position paper is simply not a concession by the State that the LECRE had a disparate impact upon women as Vingi contends, but rather an acknowledgment that the *absolute* number of women at that banding remained low.

Thus, Vingi has failed to establish a prima facie case of disparate impact. Consequently, the question of the 1991 LECRE's validity need not be reached. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (employer's burden of demonstrating employment requirement has a manifest relationship to employment arises only after plaintiff's prima facie showing); *see* 29 C.F.R. § 1607.1(B) ("These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results.").

### III. *Administrative Exhaustion.*

■ In Count II of her complaint, Vingi alleges that the State's background investigations lacked objective, ascertainable standards leading to discrimination based on gender. The State responds that Vingi's failure to address this issue in her charge to the RICHR and EEOC precludes her from now litigating this claim.

A party may generally not litigate a Title VII claim in federal court prior to exhausting his or her administrative remedies. 42 U.S.C. § 2000e–5(c). "If there exists an appropriate state agency, such as the Commission in Rhode Island, a discrimination charge must first be filed with that agency during which time, the EEOC's administrative jurisdiction is suspended for sixty days." *Paulo v. Cooley, Inc.,* 686 F.Supp. 377, 382 (D.R.I. 1988). If the issue persists subsequent to this sixty day period, the charge must be pursued at the EEOC before a claim may be filed in federal court. The Supreme Court has noted "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in the federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In the present case, there is no dispute that Vingi filed a timely charge.

■ However, "[a] complaint related to that brought before the EEOC, but which was not itself made the subject of a separate EEOC (charge) must reasonably be expected to have been within the scope of the EEOC's investigation in order to meet the jurisdictional prerequisite." *Johnson v. General Electric,* 840 F.2d 132, 139 (1st Cir.1988). In turn, the scope of the investigation will be dictated by the facts in the charge. *Ramos v. Roche Products, Inc.,* 694 F.Supp. 1018, 1025 (D.Puerto Rico 1988). As the Seventh Circuit has noted, this test grants the plaintiff significant leeway "because most EEOC charges are completed by laypersons rather than by lawyers." *Cheek v. Western and Southern Life Insurance Co.,* 31 F.3d 497, 500 (7th Cir.1994).

In her charge to the EEOC and RICHR, Vingi complains that the 1991 LECRE "cut-off score" had an adverse and disparate impact on women. There is no mention of any background investigations. In an attached, one and a half page statement "in support" of her charge, Vingi relates the facts and circumstances surrounding her numerous applications to the Academy. In reference to her 1986 application, Vingi states that it was her "understanding that a background investigation was conducted by members of the Department which may have contained inaccurate information about me and which omitted positive information." In discussing her 1990 application, Vingi relates that she does "not know whether a new background investigation was conducted or whether an updated investigation was made at that time." Other than these statements, there is no other relevant reference to any background investigation.

In her complaint, Vingi alleges that "Defendants failed to establish or enforce specific, written policies or procedures for the operation and administration of its background investigation and related personnel functions." Compl. ¶ 45. The result, alleges Vin-

gi, has been that "[d]efendants have made subjective personnel decisions, including hiring decisions, without reference to validated, ascertainable standards and have departed from such standards as do exist in decisions-making." *Id.* ¶ 46. Moreover, the State "improperly collected, reported, and summarized background information concerning Plaintiff ... (as the State) failed to establish objective standards for the assessment or use of such information, its relevance, or appropriate importance." *Id.* ¶ 48. Thus, Vingi alleges that she was unlawfully denied equal employment opportunity based upon her gender.

Clearly, the tenor of Vingi's administrative charge centered on gender discrimination based on the alleged arbitrary "cutoff score" of the 1991 LECRE and the State's subsequent lowering of that score after the results of that test had been analyzed. In context, her brief, rather vague, statements concerning background investigations, contained in her attached "supporting statement," have little relation to her complaint that the lack of ascertainable, objective standards governing the use of information gleaned through investigations led to subjective, discriminatory decisions by investigators.

This is particularly true when noted that from the submission of her charge to the EEOC and RICHR to the initiation of this lawsuit, Vingi has been represented by the same counsel. Thus, the rationale for extending significant leeway to Title VII plaintiffs in comparing an administrative charge with a subsequent complaint is simply not implicated. *See Cheek,* 31 F.3d at 500. To allow Vingi now, represented by the same counsel at all relevant stages, to levy a claim tangentially related to her administrative charge would eviscerate the EEOC's ability and authority to facilitate the investigation and resolution of Title VII disputes. Consequently, given the context of Vingi's statements and her retention of counsel at both the administrative and trial stages, I recommend that summary judgment be granted for the State with respect to Count II of her complaint.

### IV. *Retaliation Claim.*

Count IV alleges that the "State and its agents treated (Vingi) more harshly or subjected (her) to increased scrutiny because of (her) filing of a complaint of discrimination with the (RICHR) and the (EEOC)." Compl. ¶ 64. Specifically, Vingi contends that she was not selected to the 1994 Academy because of answering "no" in response to a 1993 application question inquiring whether she had ever been a plaintiff in civil litigation. During a subsequent background interview, Vingi claims that Corporal Michael Iarossi ("Iarossi") of the Rhode Island State Police accused her of making a misleading statement on this question based on her prior filing of an administrative charge with the EEOC and RICHR in 1992.

In his rather extensive report dated April 8, 1994, Iarossi details his results of education, employment and neighborhood checks of Vingi, as well as a personal interview. From his interviews of Vingi's fellow Department of Environmental Management coworkers, Iarossi discovered much opposition to Vingi's prospects of becoming a state trooper. The employees' essentially depicted Vingi, who works as a dispatcher, as confrontational, rude and abrupt in her dealings with coworkers and the public. The 1994 investigatory report also referenced an August 17, 1986 background, investigatory report conducted as part of Vingi's 1986 Academy application. In the 1986 report, numerous coworkers were interviewed. The majority of those interviewed did not recommend her for the job. Generally, her coworkers described her as possessing an attitude problem, foul language, a temper and having problems dealing with both the public and coworkers.

Iarossi's report also contains his observations and opinions from a personal interview of Vingi. After addressing various topics with Vingi, Iarossi inquires about her negative answer to a 1993 application question, which asked whether the applicant had ever been a plaintiff in civil litigation, despite her filing a charge with the EEOC and RICHR in 1992. According to the report, Vingi responded that she did not consider herself a plaintiff having never made a formal appearance in a courtroom concerning the charge.

In subsequently recommending Vingi as not a "suitable candidate for law enforcement

employment," Iarossi lists two factors. First, "it was determined that the applicant has a propensity to short temperedness with coworkers and the general public." Secondly, "it appears that the applicant deliberately attempted to mislead or deceive the (state police)" in indicating that she had never been a plaintiff in a civil action. Iarossi reasoned that "[s]urely, someone who has worked in a law enforcement entity for the past twelve years, as a civilian employee, would be able to basically define the term, plaintiff.".

After reviewing the entire report, Vingi's claim of retaliation remains wholly speculative. Iarossi's report contains detailed findings and reaches a supportable, legitimate conclusion and recommendation that Vingi's application be rejected. Under applicable standards governing motions for summary judgment, at this juncture, Vingi must oppose the motion by presenting facts showing that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); *see Goldman*, 985 F.2d at 1116; *Lawrence*, 980 F.2d at 68; *Garside*, 895 F.2d at 48. The evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick*, 950 F.2d at 822 (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

As noted, Vingi has failed to proffer any evidence supporting her claim of retaliation. There is simply nothing to connect Vingi's allegations with the undisputed facts, other than unsupported speculation and improbable inferences. In contrast to Vingi's conclusory allegations, Iarossi's recommendation is based on a fairly extensive investigation. Consequently, in the absence of evidence to support her allegations, I recommend that summary judgment be granted for the State on this claim.

## V. *Equal Protection Claim.*

In Count V, Vingi alleges that the State "took adverse employment action against (her) on their unfounded and inaccurate suspicions, beliefs, conclusions, or reports that (she) had a lesbian sexual orientation, hosted 'wild parties' or had been publicly intoxicated." Compl. ¶ 4. As a result, Vingi claims that the State denied her the federal equal protection of the law "by treating her differently to her detriment from male applicants or male incumbent members of the Division of State Police." *Id.* ¶ 75.

During oral argument on this motion, Vingi's counsel apprised the Court that any claims based on sexual orientation have been dropped. Moreover, Vingi has failed to proffer a scintilla of evidence to support her allegations of unequal treatment based on reports of hosting " 'wild parties' " and being publicly intoxicated. Consequently, I recommend that the State's motion for summary judgment be granted as to this claim.

## VI. *State Claims.*

In her last claim, Vingi alleges the State violated Rhode Island's equal protection clause, Fair Employment Practices Act ("FEPA") and Civil Rights Act of 1990. For the reasons detailed below, I recommend that summary judgment be granted for the State on these claims.

### A. **Equal Protection and FEPA Claims.**

■ Vingi contends initially that the State violated her right to equal protection secured by the Rhode Island Constitution. R.I. Const. Art. I, § 2.[1] Presumably, Vingi implores this Court to imply a private right of action for damages under this clause. Although the Rhode Island state courts have yet to address this issue, this Court has

---

**1.** Article I, section 2 of the R.I. Constitution in pertinent part provides: "No person shall be deprived of life liberty or property without due process of law, nor shall any person be denied the equal protection of the law."

stated that "in certain circumstances," yet to be enumerated fully, a private right of action for damages "could" be implied under Rhode Island's equal protection clause. *Taylor v. State of R.I. Department of Mental Health,* 726 F.Supp. 895, 900–01 (D.R.I.1989). Applying a *Bivens* analysis, *see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the *Taylor* Court, however, declined to imply a cause of action under Rhode Island's equal protection clause because "plaintiff's Title VII and FEPA claims provide alternative avenues for relief, thus, barring an additional state constitutional claim." 726 F.Supp. at 901. Consequently, as Vingi has also included claims under Title VII and FEPA, I recommend that the State's motion for summary judgment be granted on this claim.

Vingi also alleges that the State's action violated FEPA. R.I. Gen. Laws § 28–5–1 *et. seq.* The Rhode Island Supreme Court has held that in examining FEPA claims federal decisions construing Title VII should be used as guidance. *Newport Shipyard v. R.I. Commission for Human Rights,* 484 A.2d 893, 897–98 (R.I.1984). For the reasons detailed above with respect to Vingi's Title VII allegations, I recommend that the State's motion for summary judgment be granted as to this claim.

## B. The R.I. Civil Rights Act.

Lastly, Vingi asserts that the State's conduct violated the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws §§ 42–112–1, 2, which prohibits discrimination in the making of contracts on the basis of gender. Specifically, Vingi argues that she is a third-party beneficiary of certain consent agreements between the State and various United States governmental agencies, in which the State basically agrees not to discriminate in its hiring practices. The State counters that such a claim is barred by the doctrine of sovereign immunity and, in any event, is beyond the applicable three year statute of limitations.

Even assuming Vingi is a third-party beneficiary and the relevant consent decrees are contracts within the constraints of the Civil Rights Act of 1990, Vingi has failed to proffer any sustainable facts to demonstrate that a dispute exists over whether the State discriminated against her on the basis of gender. Consequently, I recommend that summary judgment be granted for the State on this claim.

### Conclusion

For the reasons stated, I recommend that the State's motion for summary judgment be granted on all counts.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule of Court 32; Fed. R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).