Nancy SANTIAGO RIVERA, Plaintiff

v.

JOHNSON & JOHNSON and Ortho
Pharmaceutical, Defendants

No. CIV. 05–1351(JP).

United States District Court,
D. Puerto Rico.

June 5, 2006.

Celina Romany–Siaca, Celina Romany Law Office, San Juan, PR, Juan M. Frontera–Suau, Frontera–Suau Law Office, San Juan, PR, for Plaintiff.

Mariela Rexach–Rexach, Carl E. Schuster, Karem M. Rodríguez–García, Schuster & Aguiló, LLP, San Juan, PR, for Defendants.

### *OPINION AND ORDER*

PIERAS, Senior District Judge.

The Court has before it the defendant's motion for summary judgment (No. 42) and the plaintiff's opposition. The plaintiff

worked as a human resources manager for the defendants, and alleges the defendants issued her unfavorable performance evaluations due to her gender and in retaliation in violation of Title VII of the Civil Rights Act of 1964 and Puerto Rico law. The defendant moves for summary judgment on all of the plaintiff's claims. The motion is **GRANTED** on the grounds that the defendants articulated legitimate non-discriminatory and non-retaliatory reasons for the evaluations, and there is no genuine issue as to whether those reasons were mere pretext for discrimination and retaliation.

## I. STANDARD

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz*, 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner*, 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman*, 985 F.2d at 1116.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The Court lists below stipulations of the parties which were entered into at the Initial Scheduling Conference.[1]

1. The plaintiff began to work for the Johnson & Johnson family of companies on or around February 11, 1985.

2. Throughout her employment for the defendants, the plaintiff held various positions related to the Human Resources field.

3. From 1987 to May 23, 2003, the plaintiff was Human Resources Man-

---

**1.** Stipulations numbered 17 and 35 were amended at docket number 26.

ager for the Manatí operations of Ortho Pharmaceuticals, Inc.

4. At all times relevant to the complaint Ortho Pharmaceuticals was a Delaware Corporation and a subsidiary of Johnson & Johnson Corporation.

5. At all times relevant to the complaint Ortho Pharmaceuticals was authorized to conduct and conducted business in the pharmaceutical industry in Puerto Rico.

6. Johnson & Johnson headquarters are in New Brunswick, New Jersey.

7. Johnson & Johnson and Ortho Pharmaceuticals have more than fifteen employees and engage in interstate and foreign commerce by the sale, manufacture, distribution and administration in the health care business and of health care products.

8. During the plaintiff's tenure at Ortho Pharmaceuticals the organization underwent many significant changes, including mergers, transfer of products from one manufacturing plant to another and the development and implementation of the Lean Manufacturing and Process Excellence programs.

9. From May 26, 2003, up and until the present, the plaintiff occupied the position of Staffing Manager for PGSA Puerto Rico and Latin America, responsible for the Puerto Rico staffing function which serves all PGSA sites in the Island and provides selected services to Mexico and Brazil.

10. Krenly Cruz, as Ortho Manatí's General Manager, supervised the plaintiff's work for approximately nine years, until March, 2002, when he left the Manatí site in order to assume a new role within the defendants' organization.

11. In the plaintiff's 2001 year end evaluation Cruz assessed her perform-

ance at a level 5 within a scale of 1 to 9.

12. The plaintiff was not in agreement with the 2001 year end rating obtained from Cruz and so stated in her evaluation form, specifically stating that "My signature [in the document] means that this document was discussed with me although I don't agree with the final rating."

13. Ralph Díaz was appointed General Manager of Ortho Pharmaceutical on April 1, 2002.

14. As General Manager of Ortho Pharmaceutical, Díaz was the plaintiff's direct supervisor.

15. Approximately five months after his designation, on or around September 19, 2002, Díaz met with the plaintiff to discuss her 2002 mid-year performance review.

16. The plaintiff was not in agreement with her 2002 mid-year performance rating, as well as with the deficiencies noted by Díaz during their September 19, 2002, meeting and believed that the rating obtained was the result of gender discrimination at the hands of Díaz.

17. The plaintiff requested the mediation process, which was established by Johnson & Johnson Human Resources Headquarters in New Brunswick, New Jersey, called Common Grounds.

18. On March 4, 2003, Díaz met with Santiago to discuss her 2002 final performance review. At that time, Díaz told Santiago that her performance rating would be at a level 3 within a scale of 1 to 9.

19. The plaintiff was not in agreement with the result of her 2002 year-end evaluation.

20. The Common Ground Program was introduced on a pilot basis at several

Johnson & Johnson operating companies.

21. The Common Ground Program pilot program was implemented in Puerto Rico on or around May 1, 2002.

22. On or around May 10, 2002, the plaintiff completed a training course on "How to Achieve Agreements through Common Ground."

23. The parties stipulate all of the language in the Common Ground Program manual.

24. The Mediation part of the Common Ground Program was not automatically available to Puerto Rico employees. Puerto Rico employees had to specifically request that the option be made available to them and receive approval.

25. The plaintiff started Open Door, the first step of the Common Ground Program, in September of 2002 when she met with Díaz.

26. On March 13, 2003, after receiving from Díaz a performance rating of 3 in her year end evaluation, the plaintiff requested in writing to Dolores Calicchio and Laura Rodríguez to engage in the Facilitation part of the Common Ground Program to resolve the dispute.

27. The Facilitation Phase of the Common Ground Program began on March 14, 2003, and Jacqueline Font was chosen as the facilitator.

28. On or around May 20, 2003, Santiago accepted a Staffing Manager position at Pharmaceutical Sourcing Group for the Americas.

29. The plaintiff's last day of work under the supervision of Díaz was on or around May 23, 2003.

30. The plaintiff began work as a Staffing Manager at PSGA on May 26, 2003.

31. The first Common Ground Program facilitation meeting regarding the plaintiff's dispute about her 2002 year end performance evaluation took place on or around November 4, 2003.

32. The second Common Ground Program facilitation meeting regarding the plaintiff's dispute about her 2002 year end evaluation took place on December 11, 2003.

33. The parties were unable to resolve their issues during facilitation and on January 19, 2004, the Plaintiff requested mediation.

34. On January 19, 2004, the plaintiff submitted a completed Mediation Request Form which was later approved. The letter requesting mediation was dated January 9, 2004.

35. On June 25, 2004, the plaintiff filed a charge of discrimination with the EEOC alleging that Ortho had discriminated against her on account of her gender.

36. Johnson & Johnson was not included in the June 25, 2004, charge of discrimination.

37. The plaintiff requested from the EEOC the issuance of a right to sue on November 18, 2004.

38. The EEOC issued a right to sue letter on December 30, 2004, without determining either the merits of the plaintiff's complaint nor whether her complaint was timely.

39. On January 3, 2004, the plaintiff received the right to sue letter from the EEOC.

40. The plaintiff holds a B.A. in Social Work and Psychology from the University of Wisconsin.

The Court lists below material facts not in genuine issue or dispute that were properly supported by the defendants and not contested by the plaintiff.

1. As Human Resources Manager the plaintiff was responsible for knowledge of discrimination laws, and for managing and implementing equal employment opportunity policies, including anti-discrimination policies.

2. Throughout her employment with the defendants the plaintiff attended several continuing legal education seminars dealing with employment legislation.

3. As a human resources professional the plaintiff knew that in Puerto Rico there is a 300 day limit to file a complaint before the EEOC.

4. Before 2002 concerns were raised regarding the plaintiff's performance.

5. Laura Rodríguez spoke with Santiago regarding her performance, in particular her lack of involvement with the facility and complaints from her Manatí Human Resources Staff regarding over-delegation.

6. On or around 2001 Johnson & Johnson reorganized its pharmaceutical manufacturing companies and created a common reporting management organization. As a result the operations of Ortho Manatí's site became part of what came to be known as the Pharmaceutical Sourcing Group for the Americas (PSGA).

7. The concept of the new organization was that of a contract manufacturer, primarily focused on efficiencies, containment of costs, and developing talent.

8. In the plaintiff's 2001 year end evaluation Cruz assessed her performance at a level 5 in a scale of 1 to 9.

9. The plaintiff was not in agreement with the 2001 year end rating she obtained from Cruz, and so stated on her evaluation form. The source of her disagreement included the coaching function and the technical training

strategy. She believed the evaluation did not reflect her performance in these areas.

10. The plaintiff did not welcome the appointment of Díaz as General Manager of Ortho.

11. The plaintiff characterized her relationship with Díaz as "professional," but admits Cruz and Díaz had different management styles.

12. At the time the Manatí plant underwent significant change.

13. The role of the HR Manager for the Manatí site is a critical one.

14. The Common Ground Program applicable to Puerto Rico employees provided a variety of options for resolving employment disputes, such as discussions with supervisors and facilitators.

15. The Common Ground Program pamphlet applicable to the defendants' Puerto Rico employees states that nothing in the program prevents an employee from filing a claim with a federal or state administrative agency, from cooperating with a state or federal agency investigation, or from filing a lawsuit.

16. The Common Ground Program pamphlet states that if an employee files a claim with an administrative agency or a lawsuit, the defendants would advise the agency or court of the Program and request that the agency or court dismiss or stay the case until the process is completed.

17. The Common Ground Program pamphlet also states, "If you are not satisfied after having followed all the available processes available in the Program, you are completely free to take your claim to the courts, if you wish."

18. The Common Grounds Program pamphlet does not say explicitly that

the running of the 300 day period to file a charge with the EEOC or the local Anti-discrimination Unit is tolled because of an employee's use of the program.

19. Between June and September of 2002, Díaz requested his staff members to prepare a self assessment of their performance or a draft evaluation, and to send it to him. They would later meet and discuss the self assessment and agree on a realistic rating, although that rating would not be set in stone.

20. At the meeting regarding the plaintiff's 2002 mid year performance review Díaz went over the plaintiff's goals and objectives, clarified areas he believed were key responsibilities of the position, the position's goals, and Díaz and the plaintiff agreed on whether the goals or objectives had been delayed. Díaz also read the plaintiff a paragraph in which he described the plaintiff's need to improve in certain management skills for her success in the role.

21. Díaz communicated to the plaintiff that he was not happy with her results and that she needed to inform him of everything that was happening in the plaint.

22. Díaz also noted that the plaintiff's draft of her performance had not been correctly prepared, because areas of assessment that belonged in the Key Responsibilities area had been included and rated by the plaintiff as part of her Goals and Objectives. He told her that Key Responsibilities were evaluated separately from Project Goals and Objectives and that he expected that someone who had been in Human Resources for as long as the plaintiff would have an understanding of the basic principles of how to develop performance appraisals.

23. Díaz said that the plaintiff's job performance was inadequate in many areas, including performance appraisals, communication with associates, updating personnel related policies, and execution of simple business tasks. He also stated that the plaintiff consulted lawyers excessively on issues of which she should have knowledge, and was unwilling to embrace changes that had occurred within the defendants' organization, and to establish mechanisms to help members adjust to the change.

24. Santiago was so upset upon hearing her mid year performance rating that she did not pay full attention to the comments he made at the meeting.

25. In September or October of 2002 the plaintiff met with Laura Rodríguez to discuss her 2002 mid year performance evaluation and work environment.

26. Rodríguez had received complaints from other employees, men and women, about Díaz's management style.

27. After her meeting with Rodríguez the plaintiff met with Edgardo Fábregas, then Vice President of Operations for PSGA to discuss disagreement with her 2002 mid year performance evaluation. Also present at the meeting were outside consultants for Ortho, Manuel "Coco" Morales from Quality for Business Success, and Ramón Rivera.

28. During the meeting the plaintiff requested that Fábregas help her transfer out of the Manatí plant because she did not want to work with Díaz. Fábregas then responded that he would help effect the transfer.

29. According to Díaz during the year 2002 the plaintiff's performance did

not improve. He perceived that she failed to inform him of several situations regarding the plant, failed to attend key meetings, infrequently visited the shop floor, and used poor judgment as to when to leave on vacation.

30. Rodríguez and Fábregas agreed that the plaintiff was having difficulty meeting the job requirements as Human Resources Manager.

31. The plaintiff failed to immediately inform Rodríguez of an employee's resignation letter, causing Rodríguez to travel from Brazil to Puerto Rico on an emergency basis to address the public relations exposure the resignation created for the defendants.

32. Before becoming final evaluations of management employees go through a process called "normalization" during which other members discuss the ratings and challenge them when necessary in order to ensure that they fell within the normal distribution curve.

33. An evaluation of a Human Resources Manager, such as the plaintiff, underwent two normalization processes.

34. An employee's salary at Johnson & Johnson is determined on the basis of percentiles. Every salary band has a minimum and maximum percentile, or benchmark scale (market salary data). Merit increases depend in part on where on the benchmark scale an employee lies. The lower an employee is on the benchmark scale, the higher the merit increase can be. If the employee is already on the upper part of the scale the merit increase is comparatively lower.

35. In her March 13, 2003, letter to Rodríguez and Calicchio, her first written communication to them, the plaintiff stated that she considered her evaluations by Díaz discriminatory, and requested the Facilitation part of the Common Ground Program.

36. After her March 13, 2003, communication the plaintiff met with Calicchio, then Vice President of Human Resources for PSGA, and requested to be transferred, because she did not want to work with Díaz.

37. Fábregas, Rodríguez, and Calicchio looked for other positions that would allow the plaintiff to transfer from the Manatí plant.

38. A reorganization of the defendants' human resources personnel took place, and an opportunity arose for the plaintiff to transfer. The plaintiff accepted the position, a Staffing Manager position at PSGA.

39. After the plaintiff began work as a Staffing Manager, she ceased reporting to Díaz, and her salary and bonuses were not affected.

40. As Staffing Manager the plaintiff was no longer entitled to a company car, but was afforded the opportunity to purchase the company car she had been using. She accepted and purchased the car.

41. By letter dated January 9, 2004, the plaintiff informed the management that she would seek Mediation, the third stage of the Common Ground Program.

42. At some point between December 11, 2003, and January 19, 2004, the plaintiff retained legal counsel.

43. On January 19, 2004, the plaintiff sought approval for Mediation by submitting a completed Mediation Request Form. The request was later approved. On the form the plaintiff informed that she would be represented by counsel during the process.

44. The plaintiff requested that the mediation take place in Puerto Rico.

45. Mediation was delayed due to scheduling conflicts.

46. The Mediation never took place, because the plaintiff withdrew her request and filed a complaint with the EEOC.

47. On June 25, 2004, the plaintiff filed a charge of discrimination with the EEOC, alleging that Ortho discriminated against her due to her gender.

48. Johnson & Johnson, the parent company, was not notified of the June 25, 2004, charge, because the address provided was that of Ortho.

49. The charge was notified to the new Human Resources Director for the Ortho Manatí plant, Fernando Bermúdez.

50. The EEOC issued a right to sue letter on December 30, 2004.

51. The plaintiff received the right to sue letter on January 3, 2005.

52. On March 30, 2005, the plaintiff filed the instant civil action.

## III. ANALYSIS

### A. TITLE VII

The plaintiff claims that Díaz rated her performance at a three on a scale of one to nine for both her 2002 mid year and year end evaluations due to her gender. She also claims that the 2002 year end evaluation and her subsequent transfer to another position within the defendants' organization was in retaliation for her complaints to defendants' personnel about Díaz. The defendants argue that they are entitled to summary judgment on the grounds that the plaintiff failed to exhaust administrative remedies, and that the plaintiff cannot establish a prima facie case of discrimination and retaliation, and that there is no genuine issue as to whether the evaluations were motivated by gender discrimination or retaliation. Even assuming the plaintiff exhausted her administrative remedies, and established a prima facie case of discrimination and retaliation, the defendants are entitled to summary judgment on the Title VII claims, because there is no genuine issue as to whether their articulated reasons for the evaluations were pretextual.

Title VII discrimination and retaliation cases proceed under the three-step burden shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 26 (1st Cir.2004). First the plaintiff must establish a prima facie case for discrimination or retaliation. Then the burden shifts to the defendant to present a legitimate non-discriminatory, or, if retaliation is claimed, non-retaliatory reason for the adverse employment decision. Finally the plaintiff must demonstrate that the defendant's articulated reason is mere pretext for discriminatory or retaliatory animus. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Quinones v. Buick,* 436 F.3d 284, 289 (1st Cir.2006).

The defendants articulated legitimate non-discriminatory and non-retaliatory reasons for their employment decisions. The defendants argue the plaintiff's evaluations were warranted by her deficient performance. The undisputed facts show that Rodríguez and Fábregas agreed the plaintiff did not meet her job requirements as Human Resources Manager. After the mid year performance evaluation, Díaz observed that the plaintiff's performance did not improve, and consequently did not increase her rating for the year end evaluation. The defendants argue the plaintiff was transferred to the Staffing Manager position, because, as the uncontested facts

show, she no longer wished to work with Díaz, she requested to be moved to the Manatí plant, and accepted the new position.

■ The plaintiff failed to present any evidence the defendants' articulated reasons were mere pretext for discrimination or retaliation for her complaints to her supervisors. Even in cases where motive or intent are at issue, "summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inference, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). The plaintiff attempts to raise a genuine issue as to the defendants' motives for the evaluations with evidence that the rest of Díaz's direct reports at the Manatí plant were male, and received a five or more for their mid year review, and that Luis Zayas, Díaz's close friend and best man at his wedding received an eight after working at the plant for only three months. However the plaintiff failed to give any information that indicates these reviews did not reflect the employees' performance. The mere fact that these employees were male and received higher performance ratings does not indicate that the plaintiff's lower rating was due to her gender. The plaintiff also provided evidence that other employees complained to her about a "men's club" composed of Díaz, Luis Zayas, Larry Rosario, and Humberto Martín, and that they believed that if an employee was not a part of the club then that employee was at a disadvantage. However the plaintiff failed to provide any evidence that supports her or the complaining employees' speculation as to the presence of disparate treatment. A female employee complained to the plaintiff that Martín made "dirty jokes." However the plaintiff herself testified in her deposition that no employees complained to her about Díaz, the author of her disputed evaluations. The plaintiff gives abundant evidence that Díaz had a demanding management style, and was eventually transferred to a position with fewer direct reports. It is also clear that Díaz requested the plaintiff be terminated from her position, and that upper management instead opted to provide the plaintiff with more training. These facts do not support an inference that Díaz based his evaluations on discrimination or retaliation.

With respect to the plaintiff's retaliation claim regarding her transfer, it is clear that the plaintiff complained about her evaluations within the company, but the plaintiff failed to provide any evidence that her transfer was due to her complaints, or was the result of anything other than her own request to be transferred. Because there is no evidence of pretext for gender discrimination or retaliation, the defendants are entitled to summary judgment on the Title VII claims.

## B. LAW 100

■ The plaintiff also claims the defendants' actions violated Puerto Rico's Law 100. Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29 § 146 et seq., is Puerto Rico's general employment discrimination statute. *See Cardona Jiménez v. Bancomerico de Puerto Rico*, 174 F.3d 36, 42 (1st Cir.1999); *see also Álvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 27 (1st Cir.1998). Under Law 100, the employee has the initial evidentiary burden to establish three factors: (1) that he or she suffered an adverse employment action, (2) that the adverse employment action was unjustified (not for good cause), and (3) some basic fact substantiating the type of discrimination alleged. *Morales v. Nationwide Ins. Co.*, 237 F.Supp.2d 147, 153 (D.P.R.2002). If the employee establishes these three factors,

the burden shifts to the employer to prove by a preponderance of the evidence that the adverse employment action "was not motivated by discriminatory animus." *Id.,* at 153. It is not necessary for the employer to "articulate a reasonable explanation for the [adverse employment action]." *Ibañez v. Molinos de P.R.,* 14 P.R. Offic. Trans. 61, 76, 1983 WL 204221 (1983). If the employer rebuts the presumption, then the employee has the burden of proving the existence of discrimination. *Morales,* 237 F.Supp.2d at 153. To determine what constitutes good cause under a Law 100 claim, a court looks to the definition of good cause in Law 80. *Báez García v. Cooper Labs, Inc.,* 120 P.R. Offic. Trans. 153, 161, 1987 WL 448243 (1987).

■ The defendants are entitled to summary judgment on the plaintiff's Law 100 claims, because even assuming the defendants' employment decisions were not made for good cause, as discussed in the context of the plaintiff's Title VII claims, there is no genuine issue as to whether the defendants' actions were motivated by discriminatory animus.

## C. ACT 69

■ The plaintiff also claims the defendants retaliated against her in violation of Puerto Rico's Act 69. Act 69 of July 6, 1985, as amended, P.R. Laws Ann. tit. 29 § 1321–1341, is Puerto Rico's gender employment discrimination statute. Under Act 69 it is unlawful for an employer "to dismiss or discriminate against any employee or participant who files a complaint or charge, or is opposed to discriminatory practices, or participates in an investigation or suit for discriminatory practices against the employer." P.R. Laws Ann. tit. 29 § 1340.

■ The defendants are entitled to summary judgment on the plaintiff's Act 69 claim, because as discussed in the con-

text of the plaintiff's Title VII claims, there is no genuine issue as to whether the defendants transferred the plaintiff in retaliation for her complaints about Díaz.

## V. CONCLUSION

The Court **GRANTS** the defendants' motion for summary judgment, and will enter judgment dismissing the complaint with prejudice.

**IT IS SO ORDERED.**